# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **PATRICK SAWYER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 20-cv-3211** |
| | ) | |
| **STEVEN KOTTEMANN,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>ORDER ON MOTION FOR SUMMARY JUDGMENT</u>

This matter comes before the Court for ruling on Defendants' Motion for Summary Judgment under Federal Rule of Civil Procedure 56 and Local Rule 7.1. (Doc. 66). For the reasons below, Defendants' Motion is GRANTED.

## BACKGROUND

Plaintiff Patrick Sawyer filed a complaint under 42 U.S.C. § 1983 alleging that Defendants Dr. Steven Kottemann, Franklin Brown, and Kayla McClaren were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment while he was incarcerated at Lincoln Correctional Center ("Lincoln"). (Doc. 1). Specifically, Plaintiff alleges Defendants were deliberately indifferent to the treatment of his Crohn's disease and anemia and failed to provide appropriate medical care following a fall he sustained in the shower on August 10, 2019.

Defendants filed a Motion for Summary Judgment (Doc. 66); Plaintiff filed a Response (Doc. 69); and Defendants filed a Reply (Doc. 76). This Order now follows.

## MATERIAL FACTS

*Parties*

Plaintiff is an inmate in the custody of the Illinois Department of Corrections ("IDOC") and is presently housed at Pontiac Correctional Center. During the relevant time period, he was incarcerated at Lincoln.

Defendant Dr. Kottemann was employed by Wexford Health Sources, Inc. ("Wexford") as the Site Medical Director ("Medical Director") at Lincoln between October 2015 and March 2020. As the Medical Director, Dr. Kottemann was responsible for the care of approximately 1,000 male inmates, including Plaintiff.

Defendants Brown and McClaren were registered nurses. They were employed by Wexford and worked at Lincoln during the relevant time period.

*Medical Treatment for Crohn's Disease and Anemia*

Plaintiff was diagnosed with Crohn's disease in 2006 and experiences flare-ups every two or three months.

According to Plaintiff's medical records, Dr. Kottemann first noted Plaintiff's anemia in September 2018 and treated him in October and November 2018. (Doc. 71 at pp. 2-3, 6).

Dr. Kottemann saw Plaintiff around January 22, 2019, and referred Plaintiff to Dr. Kaiser, a gastroenterologist, to be re-evaluated due to Plaintiff's abdominal pain, rectal bleeding, a history of Crohn's disease, and anemia.

Plaintiff's first visit with Dr. Kaiser was in January 2019. Dr. Kaiser recommended a surgical procedure, but Plaintiff declined because "he didn't feel like [he] needed to be

cut." (Doc. 66-1 at 17:2–4). Dr. Kaiser performed a colonoscopy and a CT enterography. The results were normal, and there was no evidence of a Crohn's disease flare-up. It was determined that Plaintiff suffered from anemia and his iron level was low.

Dr. Kottemann followed Dr. Kaiser's recommendations to give Plaintiff a probiotic and continued his other medications. One of those medications was Imuran, which Plaintiff had been prescribed since 2006. Imuran came in pill form, and Plaintiff was permitted to keep the medication in his cell to take twice a day.

On April 23, 2019, Plaintiff's labs showed he was anemic. Defendant Kottemann determined the cause of Plaintiff's mild, chronic anemia was low iron levels stemming from use of an acid-blocking drug which inhibits the body's absorption of iron. (Doc. 66-2 at 19:11-5). Dr. Kottemann prescribed iron and vitamin C to address Plaintiff's anemia. Dr. Kottemann continued monitoring Plaintiff's anemia by periodically having labs drawn and evaluating the results.

During an examination on May 6, 2019, Dr. Kottemann noted: Chief Complaint: follow up Anemia; S): only taking one 50 mg Imuran. Feels fine, no belly pain. BMs black but never bloody. Refused double balloon enterography to further evaluate equivocal CT report, not believing problem is surgical. O) looks well, belly flat, nontender, with no masses, bowel sounds normal. P) Med change: stop Pepcid; start probiotic: 1 every day for 6 months. Decrease Imuran to 1 every day for 3 months. Lab in 2 months; CBC, retic count, Vitamin B-12, CMP, ESR. CBC of 4/23/2019 Hemoglobin down to 10.5, Hematocrit 34.4. White blood cell count and platelet in range. "A": Anemia not responding to iron

potentially because HZ blocker decreases gastric acidity. Crohn's quiet at this time. See MD a week after labs done. (Doc. 66-5 at pp. 28-30).

On May 21, 2019, Plaintiff's hemoglobin level test showed that his hemoglobin level was still low.

On July 28, 2019, Plaintiff reported to the Health Care Unit complaining of a flare-up of his Crohn's disease. Plaintiff was prescribed prednisone and placed on 23-hour evaluation until Dr. Kottemann could examine him the following day. Dr. Kottemann ordered labs, which showed that Plaintiff was still anemic. (Doc. 66-2 at 85:23-86:5).

Dr. Kottemann admitted Plaintiff to the infirmary on July 29, 2019. (*Id*. at 51:7-52:3; Doc. 66-5 at pp. 44-47). Plaintiff told Dr. Kottemann that he believed the flare-up was caused by a conversation he had with his ex-wife two weeks prior, that he was feeling better, and wanted to go back out on the grounds. (Doc. 66-1 at 39:21-40:22; Doc. 66-2 at 93:21-94:11; Doc. 66-5 at pp. 44-47). Dr. Kottemann examined Plaintiff, determined that Plaintiff had experienced a mild relapse due to a Crohn's flare-up, and concluded that his condition was improving. Dr. Kottemann prescribed prednisone, Tylenol, and tramadol and continued his prescription for Imuran. Dr. Kottemann noted that Plaintiff, on his own accord, was taking Imuran only once a day. Dr. Kottemann instructed Plaintiff to take Imuran twice a day as prescribed.

Dr. Kottemann wanted Plaintiff to remain in the infirmary for three days for observation, but he was discharged on July 29, 2019, because another inmate with more acute medical conditions needed the bed. Plaintiff claims that on July 29, 2019, he showed a nurse there was blood in his stool. (Doc. 66-1 at 43:7-11). Dr. Kottemann testified that

4

"[t]he nurse never observed that [diarrhea and rectal bleeding]. I don't think he even said he did." (Doc. 66-2 at 53:21-24). Dr. Kottemann scheduled Plaintiff for a follow-up visit on August 2, 2019.

On August 2, 2019, Dr. Kottemann saw Plaintiff for his follow-up appointment. Plaintiff reported that he had been eating food in the mess hall and from commissary and needed to take tramadol after eating. Plaintiff also reported that he increased his Imuran dose to three times a day on his own accord. Dr. Kottemann noted that Plaintiff was not having diarrhea, but he had a red streak in his eye, which he developed after vomiting. (Doc. 66-2 at 59:17-60:12; Doc. 66-6 at 1-2). Plaintiff claims that he was still experiencing bloody diarrhea on August 2, 2019. (Doc. 66-1 at 47:2-13). Dr. Kottemann assessed Plaintiff, finding that he had a good response to the prednisone and only lost a pound since April 2019. Dr. Kottemann instructed Plaintiff to take Imuran as prescribed and not to change the dosage.

According to Plaintiff's medical records, he did not see a medical provider between August 2, 2019 and August 10, 2019. (Docs. 66-5, 66-6, 66-7 66-8, and 66-9).

*Fall on August 10, 2019*

Around 7:05 p.m. on Saturday, August 10, 2019, Plaintiff fell in the shower, hit his head, and was bleeding. Defendant Nurse McClaren, who worked the 7:00 a.m. to 7:00 p.m. shift, volunteered to go to the housing unit with a wheelchair to get Plaintiff and bring him back to the nurses' station at the Health Care Unit for medical treatment. Nurse McClaren testified that Plaintiff told her he bumped his head and his head hurt. (Doc. 66-3 at 12:17-19). Plaintiff testified he tried to explain to Nurse McClaren that his neck hurt

and that he wanted to go to the hospital. (Doc. 66-1 at 51:3-11). Plaintiff claims Nurse McClaren dismissed his complaints, told him to "shut up," and said she did not have time because she was getting off work. *Id.* at 51:12-17; 65:9-14.

Plaintiff testified that when he arrived at the nurses' station, he told Nurses McClaren and Brown that he needed to go to the hospital. (Doc. 66-1 at 52:22-23). Defendant Nurse Brown, who worked the night shift, took over Plaintiff's care, and Nurse McClaren left because her shift was over.

Nurse Brown took Plaintiff's vitals and performed a neurological assessment; the results were normal. Plaintiff denied any pain and walked freely around the cell. Nurse Brown gave Plaintiff Tylenol, ice for his head, and juice boxes and instructed Plaintiff to stay in bed and not to get up without someone present.

Around 8:45 p.m., Nurse Brown called Dr. Kottemann to inform him that Plaintiff had a bloody bowel movement, as Nurse Brown knew Plaintiff has Crohn's disease. Dr. Kottemann told Nurse Brown that the blood in Plaintiff's stool was due to hemorrhoids. (Doc. 66-4 at 38:14-18). Dr. Kottemann planned to examine Plaintiff first thing in the morning on Monday, August 12, 2019.

According to Nurse Brown, he checked on Plaintiff throughout the night. (Doc. 66-4 at 38:15-19). Each time Nurse Brown observed Plaintiff walking around his cell, he instructed Plaintiff to get back in bed. *Id.* Plaintiff disputes that Nurse Brown checked on him during the night, because according to the nursing notes, Nurse Brown did not check on him from 8:45 p.m. until 1:00 a.m. (Doc. 69 at p. 10, ¶ 28). A nursing note indicates that

Nurse Brown checked on Plaintiff at 1:00 a.m. and noted he was sleeping and showed no signs of distress. (Doc. 66-4 at 97; Doc. 66-6 at pp. 5-6).

*Fall on August 11, 2019*

At some point, Plaintiff fell out of the bed. When he awoke, he was lying in a pool of blood the size of two basketballs and could not move his arms or legs. He tried to yell for help but could not. Lieutenant Allen found him on the floor around 2:20 a.m. The parties dispute when Plaintiff fell and how long he remained on the ground.

Plaintiff suffered an injury on his right eyebrow and a laceration on top of his head, he bit his lip, was confused, and could not sit up. Nurse Brown alerted security to call 911 and said to tell them it was a head injury so they would get there faster. Nurse Brown took Plaintiff's vitals and cleaned his head. Plaintiff was placed in a neck brace and taken to the ambulance on a stretcher.

Plaintiff was taken to St. John's Hospital in Springfield, Illinois, where his head wounds were treated, and he was given six pints of blood. At the hospital, Plaintiff's hemoglobin was down to 6.6. Plaintiff needed spinal decompression surgery, but it could not be performed until his hemoglobin was raised to at least 9. Plaintiff informed hospital personnel that he had experienced rectal bleeding for four to five days prior to his admittance. A gastroenterologist was consulted about the rectal bleeding. Plaintiff was found to have an unknown Salmonella infection; a PCR panel was scheduled; and Plaintiff was prescribed Ciprofloxacin for two weeks. Additionally, a previously unknown membrane was discovered across the outflow of Plaintiff's heart.

Dr. Kottemann testified Plaintiff fell in the shower due to a combination of unknown factors, including a Salmonella dysentery infection, a previously unknown membrane across the outflow of his heart, and a preexisting ruptured disc in his neck. (Doc. 66-2 at 30:15-21; 32:23-33:3). Dr. Kottemann also testified that Plaintiff showed no signs or symptoms of needing a cardiac workup prior to the fall and did not have any condition that he could have treated which would have prevented the fall from happening. *Id.* at 30:15-21, 32:3-6, 61:18-24. Plaintiff asserts Dr. Kottemann knew he had Crohn's disease and anemia, and a patient who suffers from anemia can experience syncope (fainting or falling down). (Doc. 69 at p. 12; Doc. 66-2 at 25:13-18).

Since the fall, Plaintiff testified that he suffers from memory issues, has difficulty sleeping, a stiff neck, and a constant shooting pain down his left side and arm. Plaintiff claims he has an irregular gait and cannot walk fast, run, or jog. Plaintiff takes tramadol and Tylenol for pain and Gabapentin to loosen his joints. (Doc. 66-1 at 76-77, 79, 91-94).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson v.*

8

*Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004). In order to successfully oppose a motion for summary judgment, a plaintiff must do more than raise a "'metaphysical doubt' as to the material facts, and instead must present definite, competent evidence to rebut the motion." *Michael v. St. Joseph Cnty.*, 259 F.3d 842, 845 (7th Cir. 2001) (internal citation omitted).

## DELIBERATE INDIFFERENCE STANDARD

To establish an Eighth Amendment violation by a prison official for failure to provide adequate medical care, a prisoner "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 105-106 (1976); *Farmer v. Brennan*, 511 U.S. 835, 837 (1994). Deliberate indifference involves a two-part test. The plaintiff must show that (1) the medical condition was objectively serious, and (2) the prison official acted with deliberate indifference to his medical need, which is a subjective standard. *Sherrod v. Lingle*, 223 F.3d 605, 619 (7th Cir. 2000).

"To show deliberate indifference, the plaintiff must demonstrate that the defendant was actually aware of a serious medical need but then was deliberately indifferent to it." *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009). In other words, "a plaintiff must provide evidence that an official *actually* knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (emphasis in original) (citing *Farmer*, 511 U.S. at 844)). "This is a high bar 'because it requires a showing

[of] something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) (quoting *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012)).

"A medical professional's deliberate indifference may be inferred when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *King v. Kramer*, 680 F.3d 1013, 1018-19 (7th Cir. 2012) (internal quotation omitted). "[M]ere negligence" or even civil "objective recklessness" simply "is not enough." *Petties*, 836 F.3d at 728; *Farmer*, 511 U.S. at 836-38. "This subjective standard requires more than negligence and it approaches intentional wrongdoing. The Supreme Court has compared the deliberate indifference standard to that of criminal recklessness." *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) (citing *Farmer*, 511 U.S. at 837) (internal citations removed)). A prisoner's "dissatisfaction with a doctor's prescribed course of treatment" is not enough to sustain a deliberate indifference claim "unless the medical treatment is so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996); *see also Peterson v. Wexford Health Sources, Inc.*, 986 F.3d 746, 752 (7th Cir. 2021).

It is "implicit in the professional judgment standard itself" that "inmate medical care decisions must be fact-based with respect to the particular inmate, the severity and stage of his condition, the likelihood and imminence of further harm and the efficacy of available treatments." *Petties*, 836 F.3d at 729 (quoting *Roe v. Elyea*, 631 F.3d 843, 859 (7th

Cir. 2011)). When a prison medical professional employs his or her professional judgment, that decision is "entitled to deference" unless "no minimally competent professional would have so responded under those circumstances." *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008). Plaintiff must present evidence the medical professional "knew better than to make the medical decisions that [he] did." *Petties*, 836 F.3d at 731; *see also Collingnon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998). "An inmate who complains that delay in medical treatment rose to a constitutional violation must place *verifying medical evidence* in the record to establish the detrimental effect of delay on medical treatment to succeed." *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996) (emphasis in original).

## ANALYSIS

Defendants argue they are entitled to summary judgment because they utilized their professional medical judgment while treating Plaintiff; Plaintiff cannot establish the elements of deliberate indifference necessary to succeed on his claims; and Plaintiff merely alleges a disagreement with a prescribed course of treatment. Defendants do not dispute that Plaintiff suffered from an objectively serious medical condition. As such, Plaintiff's claim hinges upon whether Defendants acted with deliberate indifference.

I.   **Defendant Kottemann was not deliberately indifferent to Plaintiff's serious medical needs.**

Plaintiff alleges Dr. Kottemann was deliberately indifferent to the treatment of his Crohn's disease and anemia and following his fall in the shower on August 10, 2019.

### A. Crohn's disease

When Plaintiff complained about symptoms of his Crohn's disease in January 2019, Dr. Kottemann immediately referred him to a gastroenterologist. Plaintiff saw the gastroenterologist, Dr. Kaiser, for an evaluation in January 2019, and saw him several times thereafter. Dr. Kaiser performed a colonoscopy and a CT enterography, and the results were normal. Plaintiff refused the surgical procedure that Dr. Kaiser recommended. Dr. Kottemann implemented Dr. Kaiser's recommendations to prescribe a probiotic and continue Plaintiff's other medications.

On July 28, 2019, Plaintiff complained about a flare-up of his Crohn's disease. Plaintiff was prescribed prednisone to treat the flare-up. Dr. Kottemann ordered labs and placed Plaintiff on a 23-hour observation until he could examine him the next day.

When Dr. Kottemann examined Plaintiff on July 29, 2019, Plaintiff reported that he was better and wanted to go back out on grounds. (Doc. 66-1 at 39:21-40:22; Doc. 66-2 at 93:21-94:11). Dr. Kottemann determined that Plaintiff had experienced a mild relapse of his Crohn's disease, but his condition was improving. Plaintiff informed Dr. Kottemann that he lowered his dose of Imuran on his own to once a day; Dr. Kottemann instructed Plaintiff to take it twice a day as prescribed. Dr. Kottemann prescribed Tylenol, tramadol, and prednisone. *Id.* at 94:13-20.

Dr. Kottemann originally planned to keep Plaintiff in the infirmary for three days and monitor Plaintiff's bowel movements, but Plaintiff was released earlier than anticipated because another inmate with more acute needs needed the space. Plaintiff claims he showed a nurse blood in his stool and asked why he was being discharged from

12

the infirmary, but there is no objective evidence that Plaintiff was bleeding at the time of his discharge. Dr. Kottemann scheduled a follow-up visit with Plaintiff on August 2, 2019.

During the follow-up appointment on August 2, 2019, Plaintiff reported he had been eating food from the mess hall and commissary and needed to take tramadol after eating. Dr. Kottemann noted in the chart that Plaintiff had only lost one pound since April 2019, was not having diarrhea, and had responded well to prednisone. Plaintiff told Dr. Kottemann that he was taking Imuran three times a day, and Dr. Kottemann again instructed Plaintiff to take Imuran as prescribed.

Here, the Court finds the evidence shows Dr. Kottemann provided consistent care for Plaintiff's Crohn's disease, which included a referral to a specialist, diagnostic procedures, and medication. Dr. Kottemann placed Plaintiff on observation and ordered labs when his condition flared-up on July 28, 2019, and examined him on July 29, 2019. Plaintiff argues he should have remained in the infirmary for three days when he experienced a flare-up, but Dr. Kottemann examined Plaintiff again only a few days later on August 2, 2019, and noted his condition had improved.

As demonstrated by the medical records, Plaintiff was not compliant with his medications because he had not been taking Imuran as prescribed. He was self-administering his medication contrary to Dr. Kottemann's instructions.

The cause of Plaintiff's falls on August 10 and 11, 2019 is unknown. Plaintiff has not presented any objective evidence that his Crohn's disease caused or contributed to his falls. "[S]ummary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its

version of events." *Johnson v. Cambridge Industries, Inc.*, 352 F.3d 892, 901 (7th Cir. 2003) (internal quotations and citation omitted). Therefore, the Court finds that Dr. Kottemann was not deliberately indifferent to Plaintiff's Crohn's disease.

## B. Anemia

In April 2019, lab tests revealed Plaintiff had mild, chronic anemia. Dr. Kottemann believed the anemia was caused by Plaintiff's use of an acid-blocking drug which inhibited the absorption of iron. (Doc. 66-2 at 19:11-20:5). To treat Plaintiff's anemia, Dr. Kottemann prescribed iron and vitamin C. Dr. Kottemann monitored Plaintiff's anemia by regularly evaluating his bloodwork. Each time, Dr. Kottemann noted Plaintiff's condition as a mild, chronic anemia.

Based on the undisputed evidence, the Court finds that Dr. Kottemann was not deliberately indifferent to Plaintiff's anemia. He regularly monitored Plaintiff's anemia and prescribed medication. While Plaintiff claims Dr. Kottemann should have done more, a prisoner's "dissatisfaction with a doctor's prescribed course of treatment" is not enough to sustain a deliberate indifference claim "unless the medical treatment is so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." *Snipes,* 95 F.3d at 592 (7th Cir. 1996). There is no indication that Dr. Kottemann's actions were blatantly inappropriate. Other than his own opinion, Plaintiff has not presented objective evidence that his anemia caused or contributed to his falls. Plaintiff's claims related to the treatment of his anemia fall far short of the demanding standard for deliberate indifference.

14

### C. Fall in shower on August 10, 2019

Plaintiff also alleges that Dr. Kottemann was deliberately indifferent to his head injury after he fell in the shower on August 10, 2019, because he placed Plaintiff in the infirmary for observation until he could examine him instead of calling an ambulance to take Plaintiff to the hospital. Plaintiff also claims Dr. Kottemann was deliberately indifferent to his serious medical needs because, when Nurse Brown notified him about Plaintiff's bloody stool, Dr. Kottemann determined the blood was caused by hemorrhoids without physically examining Plaintiff.

Prior to Plaintiff's fall in the shower, the undisputed evidence shows that Dr. Kottemann had been consistently monitoring Plaintiff's blood, and there is no evidence that Dr. Kottemann consciously disregarded an excessive risk or that he acted negligently, let alone with deliberate indifference. The medical records show that the neurological evaluation after the fall was normal; Plaintiff's vitals were normal; and there was no redness and swelling. No reasonable jury would find that the decision to keep Plaintiff under observation instead of calling an ambulance was blatantly inappropriate. This type of decision is a "classic example of a matter for medical judgment." *Estelle*, 429 U.S. at 107; *see also West v. Matz*, 740 F. App'x 103, 104 (7th Cir. 2018) (finding that decisions such as whether to order x-rays or additional diagnostic techniques or forms of treatment are a matter of medical judgment).

Regarding Dr. Kottemann's assessment of Plaintiff's bloody stool, Nurse Brown, who observed the stool, testified that Plaintiff's bowel movement was normal, but there was blood on top, which was indicative of hemorrhoids. (Doc. 66-4 at 37:15-17). When

Nurse Brown called Dr. Kottemann and reported it, Dr. Kottemann agreed the blood was due to hemorrhoids. *Id.* at 37:17-19. Dr. Kottemann was not deliberately indifferent by making this assessment without physically examining Plaintiff. Moreover, he planned to examine him first thing in the morning. *Id.* at 37:19-20.

The Court finds Dr. Kottemann was not deliberately indifferent to Plaintiff's serious medical needs. Therefore, summary judgment is appropriate.

**II.   Defendant McClaren was not deliberately indifferent to Plaintiff's serious medical needs after he fell in the shower on August 10, 2019.**

Defendant Nurse McClaren's sole involvement in this case was bringing Plaintiff to the nurses' station in a wheelchair after he fell in the shower on August 10, 2019, around 7:05 p.m. Plaintiff alleges that Nurse McClaren was deliberately indifferent to his serious medical needs because, when he tried to tell her about his condition and asked to go to the hospital, she dismissed his complaints and told him to "shut up." (Doc. 66-1 at 51:13-17; 65:9-14).

Nurse McClaren worked the day shift from 7:00 a.m. to 7:00 p.m. Although her shift had ended, she volunteered to transport Plaintiff back to the Health Care Unit in a wheelchair so that Defendant Nurse Brown could attend to him. (Doc. 66-3 at 7:2-13).

When she responded to the housing unit, Nurse McClaren she found Plaintiff standing in the common area. *Id.* at 6:17-18. Plaintiff appeared alert and oriented, showed no signs of acute distress, and was able to stand and talk. *Id.* at 6:20-21; 12:14-15. Nurse McClaren testified Plaintiff told her his head hurt because he bumped his head. *Id.* at

12:17-19. Nurse McClaren did not believe it was an "emergent or life-threatening event." *Id.* at 8:8-11.

Nurse McClaren wheeled Plaintiff to the nurses' station and transferred care of Plaintiff to Nurse Brown, as he was nurse on the night shift. (Doc. 66-3 at 42:24-43:5). Nurse McClaren then went home, as her shift had ended.

Here, the Court finds that Nurse McClaren's limited involvement in this matter does not amount to deliberate indifference under the Eighth Amendment. *See Walker v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000) (deficiencies in isolated aspects of prisoner's treatment do not establish deliberate indifference); *Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997) (internal citation omitted). When Nurse McClaren took Plaintiff to the nurses' station, she had no further involvement and knew Nurse Brown would provide medical care.

Even if Nurse McClaren was dismissive of Plaintiff's complaints and told him to "shut up," there is no indication that electing not to call an ambulance was blatantly inappropriate. In her professional judgment, the situation was not "emergent," as Plaintiff appeared alert and oriented. As Plaintiff's injury report indicates, there was no redness or swelling and no injury was noted. (Doc. 66-10 at pp. 1-2).

No reasonable jury would find that Nurse McClaren intentionally disregarded a known risk to Plaintiff's health or engaged in "criminally reckless conduct." *See Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006) (Deliberate indifference requires proof "that an individual defendant intentionally disregarded the known risk to inmate health or safety."). Therefore, Nurse McClaren is entitled to summary judgment.

III.    **Defendant Brown was not deliberately indifferent to Plaintiff's serious medical needs following his fall in the shower on August 10, 2019.**

Plaintiff alleges Defendant Nurse Brown should have called an ambulance after he fell in the shower on August 10, 2019, because Plaintiff informed him that he was weak, he did not know why he fell, he hit his head, and his neck hurt. Plaintiff also argues that Nurse Brown should have checked on him more than once in the night, especially because of his Crohn's disease and anemia.

Defendant Brown argues he was not deliberately indifferent to Plaintiff's serious medical needs because he utilized his professional medical judgment during the course of Plaintiff's treatment.

Based on the undisputed evidence, the Court finds that Nurse Brown's treatment of Plaintiff after the fall on August 10, 2019, does not rise to the level of deliberate indifference. When Plaintiff arrived at the Health Care Unit, Nurse Brown performed a neurological evaluation, took Plaintiff's vitals, and instructed him to lie down and not get up without assistance. (Doc. 66-4 at 34:21-24). The injury report indicates that the neurological evaluation was normal; Plaintiff's head had no redness or swelling; his vitals were stable; and no injury was noted. (Doc. 66-10 at pp. 1-2). Nurse Brown placed Plaintiff under observation in the infirmary as Dr. Kottemann had instructed.

When Nurse Brown observed that Plaintiff's stool was bloody, he called Dr. Kottemann and advised him of Plaintiff's condition. Nurse Brown also provided Tylenol, ice for his head, and juice, instructed Plaintiff to ask for assistance if he needed to get up out of bed, and checked on him at least once during the night. It is undisputed that when

18

Nurse Brown checked in Plaintiff at 1:00 a.m., he was resting comfortably and showed no signs of distress.

Plaintiff insists that Nurse Brown should have called an ambulance after he fell in the shower because he informed Nurse Brown that he was weak, he did not know why he fell, and that his neck hurt. Plaintiff's disagreement with the course of care provided does not amount to deliberate indifference. *See Young v. Cnty. of Winnebago*, No. 00 C 50382, 2003 WL 1475384 (N.D. Ill. Mar. 21, 2003) (granting summary judgment where Plaintiff believed he required stitches but lacked evidence beyond a mere disagreement with a prescribed course of treatment).

Unfortunately, Plaintiff fell again during the night and was injured, but that does not mean Nurse Brown was deliberately indifferent or caused the injury. According to the nursing notes, Plaintiff fell out of bed sometime between 1:00 a.m. and 2:20 a.m. The exact cause of the fall and when it occurred is unknown. However, it is undisputed that as soon as Nurse Brown knew Plaintiff fell, he provided immediate medical attention and called an ambulance. Plaintiff has provided no evidence that the care administered by Nurse Brown after his fall on August 10, 2019, was "such a substantial departure from accepted professional judgment, practice or standards." *See Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261-62 (7th Cir. 2015). Therefore, the Court finds that Nurse Brown is entitled to summary judgment.

**IT IS THEREFORE ORDERED:**

(1)     Defendants' Motion for Summary Judgment [66] is GRANTED. This action is DISMISSED WITH PREJUDICE. Plaintiff takes nothing. The parties will bear their own costs. The Clerk is directed to enter judgment and close this case.

(2)     Although Plaintiff's case has been dismissed, he remains responsible for the remainder of the $350.00 filing fee.

(3)     If Plaintiff wishes to appeal this judgment, he must file a Notice of Appeal with this Court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4).

(4)     To proceed *in forma pauperis* on appeal, Plaintiff must file a Motion for Leave to Proceed on Appeal *in forma pauperis* and identify the issues he will present on appeal to assist the Court in determining whether the appeal is taken in good faith. Fed. R. App. P. 24(a)(1)(c); *Celske v. Edwards*, 164 F.3d 396, 398 (7th Cir. 1999) (An appellant should be given an opportunity to submit a statement of his grounds for appealing so that the district judge "can make a responsible assessment of the issue of good faith."); *Walker v. O'Brien*, 216 F.3d 626, 632 (7th Cir. 2000) (providing that a good faith appeal is an appeal that "a reasonable person could suppose . . . has some merit" from a legal perspective). If Plaintiff chooses to appeal, he will be liable for the $505.00 appellate filing fee regardless of the outcome of the appeal.

ENTERED:     9/8/2023

s/ James E. Shadid
James E. Shadid
United States District Judge

20